IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Joann Golembiewski,                          Case No. 3:11 CV 57

               Plaintiff,             MEMORANDUM OPINION
                                             AND ORDER

    -vs-

William G. Logie, et al.,                    JUDGE JACK ZOUHARY

            Defendants.

**INTRODUCTION**

This case arises from the termination of Plaintiff Joann Golembiewski's employment with the University of Toledo ("University").  Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging violations of her First, Fifth and Fourteenth Amendment rights.  Defendants, who were University management personnel at the time of Plaintiff's employment and termination, move this Court for summary judgment (Doc. No. 28).  Defendants argue Plaintiff cannot demonstrate a constitutional deprivation and, even if she could, they are entitled to qualified immunity as a matter of law.  Plaintiff opposed Defendants' Motion (Doc. No. 32), and Defendants replied (Doc. No. 30). For the reasons set forth below, Defendant's Motion is granted.

**BACKGROUND**

Plaintiff was a civil service employee at the University of Toledo, and a member of Local 4319 of the Communication Workers of America ("Union") which had a collective bargaining agreement with the University effective through December 2011 (Doc. No. 1 at 5).  At the time of Plaintiff's employment and termination, Defendants were employed by the University: William Logie was Vice President for Human Resources and Campus Safety; Joseph Klep was Manager of Labor

and Employee Relations; and Connie Rubin was Senior Director of Employee and Labor Relations (Doc. No. 1 at 4–5). Each Defendant is sued in his or her individual capacity only -- the University has not been named as a defendant.

From 2005 until the time of her discharge, Plaintiff worked in several secretarial positions with the University (Doc. No. 27-1 at 21). In 2007, Plaintiff became a member of the bargaining committee for employees represented by the Union (Doc. No. 27-1 at 38–39). Although she never participated in the actual bargaining process, Plaintiff assisted the Union negotiation team by recommending improvements on the current collective bargaining agreement (Doc. No. 27-1 at 239–40).

One of the issues discussed at Union negotiations, relevant to this case, involved the implementation of a new attendance policy (Doc. No. 27-1 at 97). The new policy was the subject of a July 2008 agreement between the Union and the University (Doc. No. 27-1 at 288) to work together to develop a policy aimed at curbing sick-leave abuse (Doc. No. 27-2 at 19–20). In November 2008, the University President approved the new attendance policy, effective January 2009, which applied to Union members and certain non-union staff (Doc. No. 27-1 at 289–93).

In early December 2008, Plaintiff was nominated to run for unit director of the Union (Doc. No. 27-1 at 82). Around the same time, University administrators scheduled a series of meetings to explain its new attendance policy and discuss its implementation (Doc. No. 27-1 at 97). Plaintiff opposed the new policy because it only applied to Union employees and non-union classified employees -- not to University employees covered by other unions. Essentially, Plaintiff believed the policy was "discriminatory" (Doc. No. 27-1 at 97–98). Plaintiff was also upset with her Union leadership for not vigorously opposing the new policy (Doc. No. 27-1 at 130–32). For these reasons,

2

Plaintiff attended various University-scheduled meetings regarding the policy, and began soliciting signatures of fellow Union members hoping to rescind the policy (Doc. No. 27-1 at 108).

The first meeting Plaintiff attended was on December 5, 2008, the day after she accepted the nomination to run for Union unit director (Doc. No. 27-1 at 103). All employees in attendance, including Plaintiff, were paid by the University to attend (Doc. No. 27-1 at 104). During the question-and-answer part of the meeting, Plaintiff stood up and asked "why are we doing this?" causing others in attendance to respond with applause and yelling (Doc. No. 27-1 at 105). Defendant Klep, Manager of Labor and Employee Relations, asked Union President Bob Hall whether Plaintiff was "always like this?" Klep believed Plaintiff's conduct at the meeting was "disruptive and belligerent" (Doc. No. 27-2 at 7–8). Regardless, Plaintiff was not disciplined for her statement.

Plaintiff attended another policy meeting five days later, this time utilizing her "flex hours," which is accrued paid time off (Doc. No. 27-1 at 107 & 111). Plaintiff attended this meeting, as well as others, to learn more about the new attendance policy and to solicit signatures for her petition to rescind the new policy (Doc. No. 27-1 at 107–08). According to Plaintiff, there were some "rancorous and disgruntled" employees at this meeting (Doc. Nos. 32 at 7; 27-1 at 109). As attendees stood to leave the meeting, Plaintiff, who was at the back of the room, announced she had a petition to sign (Doc. No. 27-1 at 110). Klep approached Plaintiff and told her to put the petition away, explaining to Plaintiff the employees were on the University's time (Doc. No. 27-1 at 112). Plaintiff responded by telling Klep to go back to the front of the room to talk to employees who were lining up to speak with him, and said "I'm up here with a petition," "I'm not interrupting," "I'm not doing anything wrong," "the meeting is done" (Doc. No. 27-1 at 112). Plaintiff continued to circulate her petition

3

(Doc. No. 27-1 at 113), causing Klep to warn Plaintiff that ignoring his directive was insubordination. Klep also told Plaintiff he would have a discussion with her the following day (Doc. No. 27-2 at 7).

After his brief confrontation with Plaintiff, Klep approached Hall and said "[y]ou had better get control of [Plaintiff] . . . she's being grossly insubordinate and . . . discipline [is] forthcoming" (Doc. No. 27-2 at 7). Klep also relayed the incident to Defendant Rubin, Senior Director of Employee and Labor Relations (Doc. No. 27-2 at 32 & 35). Plaintiff was not disciplined for this incident, though Rubin later called Plaintiff's conduct at the meeting part of a "pattern of a failure of good behavior" (Doc. No. 27-4 at 16).

A couple weeks later, on December 22, 2008, Plaintiff used a vacation day to campaign at the University for the unit director position and to circulate her petition against the new attendance policy (Doc. No. 27-1 at 118). Plaintiff approached co-workers at their work stations to campaign and to ask them to sign the petition (Doc. No. 27-1 at 119). According to Plaintiff, she was asked by co-worker Georgina Molina to come to her station so she could sign the petition. Plaintiff approached Molina at her station, handed her a campaign flyer, and after a brief discussion, obtained Molina's signature on the petition (Doc. No. 27-1 at 121). Moments after her discussion with Plaintiff, Molina had a change of heart and decided she did not want her name on the petition. Molina looked for Plaintiff at an informational meeting being held that afternoon so she could remove her name from the petition (Doc. No. 27-1 at 343). Although Plaintiff argues she permitted Molina to remove her name from the petition without any difficulty, Klep and Rubin later received complaints from Molina and other co-workers about Plaintiff's "intimidating" behavior that day (Doc. Nos. 27-2 at 118; 27-4 at 15).

On January 5, 2009, Plaintiff sent an e-mail from home to selected Union co-workers encouraging them to come to her workstation to sign the petition between 8:30 a.m. and 5:00 p.m.

4

Plaintiff also provided her work phone number and explained she would come to the worker's station if they could not come to hers (Doc. No. 27-1 at 299).  Plaintiff sent the e-mail to the employees' University addresses -- even though she had already been warned not to use University e-mail for Union announcements.  That warning stemmed from a complaint Rubin received in 2008 regarding Plaintiff's use of the University e-mail system to solicit attendance at Union meetings.  Rubin requested a meeting with Plaintiff and her supervisor, Dr. Glenn Lipscomb, regarding the use of University equipment, time, and grant money, to perform Union business (Doc. No. 27-1 at 282–84).  The meeting took place and the matter was discussed with Plaintiff, who was reminded "not to utilize [University] equipment to send e-mails to other employees on their [University] equipment" because a good argument could be made she was misusing University property and time (Doc. No. 27-4 at 3–4).[1]  Plaintiff was not disciplined (Doc. No. 27-1 at 70).

On January 6, 2009, Rubin called Plaintiff to the Human Resources office for an investigatory interview (Doc. No. 27-1 at 137).  Rubin and Klep were in attendance, as well as Human Resources employee Linda Torbert, Plaintiff's supervisor Michael Phillips, and Union representatives Bob Hall and Bob Glover (Doc. No. 27-1 at 137–38).  During the interview, Rubin and Plaintiff discussed Plaintiff's January 5 e-mail, as well as her behavior at the attendance policy meetings and her interaction with Molina on December 22, 2008 (Doc. Nos. 27-1 at 139; 27-4 at 7).  Plaintiff was informed her use of "flex hours" had been revoked and she was specifically instructed to stay away from Molina (Doc. Nos. 27-1 at 146–47; 27-2 at 15).  Plaintiff responded she was not going to go see Molina -- "I'm not going to kill or murder her" (Doc. No. 27-1 at 147).

---

[1]

Plaintiff argues the University's policy on e-mail use did not limit e-mail usage as to content or recipient (Doc. No. 32 at 4–5).  That, however, is beside the point.  It is undisputed Plaintiff was instructed by University management to stop using University time and equipment to conduct Union business.

5

After the investigatory meeting, Rubin and Klep discussed Plaintiff's comments and demeanor -- chiefly, Plaintiff's statement after being admonished not to contact Molina. Rubin concluded there was a potential for workplace violence and it was necessary to remove Plaintiff from campus (Doc. No. 27-2 at 15). On January 7, 2009, Plaintiff was placed on paid administrative leave pending the outcome of the investigation regarding violations of University policy (Doc. No. 27-2 at 15–16). Plaintiff met with Rubin and Klep, as well as a Union representative, to review and discuss the parameters of her paid leave (Doc. No. 27-1 at 141). Plaintiff's leave letter clearly explained she was not permitted on campus absent express permission from Rubin (Doc. No. 27-1 at 300–02). In fact, Plaintiff's University ID and parking pass were taken from her, and she was instructed to immediately vacate University property (Doc. No. 27-2 at 19 & 24).

After Plaintiff was placed on paid leave, Rubin and Klep continued their investigation. Klep obtained statements from witnesses regarding the events of December 22, 2008, and early January 2009 (Doc. No. 27-1 at 303–22). On January 30, 2009, Plaintiff was given a pre-disciplinary hearing, presided over by Laura Miller, Senior Director of Benefits and HRIS for the University (Doc. No. 27-1 at 142–43). Plaintiff was represented by Union officials and had an opportunity to speak during the hearing (Doc. No. 27-1 at 147–48). Although Klep was unable to substantiate evidence Plaintiff had come onto the University's campus while on leave, he stated at the hearing she indeed had done so (Doc. No. 27-2 at 24). Klep's belief was based on the fact Rubin had a complaint Plaintiff went to Rocket Hall after being placed on leave, ignoring management's directive to immediately leave campus (Doc. No. 27-4 at 12). Plaintiff, however, denied coming onto campus during her paid leave (Doc. No. 27-1 at 148).

6

After the hearing, Plaintiff discussed the allegation she had come onto campus with her Union Representative, admitting she had in fact come onto campus while on leave, but insisting she did so on January 15, 2009 (Doc. No. 27-1 at 148), not as alleged on the day she was placed on leave. Plaintiff's Union representative advised her to e-mail Miller and explain she had violated her leave by coming onto campus. Plaintiff's violation stemmed from a request made to Rubin asking for permission to go to the University's Scott Park Campus to vote in the Union election. Rubin granted Plaintiff's request; however, Plaintiff was only permitted to go to the University's Scott Park Campus -- not Main Campus (Doc. No. 27-1 at 150–51). Despite this restriction, Plaintiff admitted to Miller she went to Main Campus, where she picked up a fellow Union member and gave her a ride to the election (Doc. No. 27-1 at 151).

Plaintiff was given copies of the evidence presented at her disciplinary hearing, which she used in responding to the allegations against her via e-mails to Miller (Doc. No. 27-1 at 143–44). On February 11, 2009, Plaintiff received a letter from Miller informing her that her employment was terminated. Specifically, the letter read (Doc. No. 27-1 at 325):

> After reviewing the relevant evidence including the email evidence you provided after the hearing and any potential aggravating / mitigating factors and the statements, it is determined that there is just cause for corrective action concerning the allegations stated above. I also determined that the infractions are sufficiently severe as to bypass the normal application of progressive discipline under Article 32.3. Therefore you shall be discharged from the University effective immediately.

Plaintiff filed a timely grievance appealing Miller's decision (Doc. No. 27-1 at 152). Because this was a termination, it was immediately processed to the "third-step" of the grievance process, which involved a hearing before a management representative. Due to Rubin and Klep's involvement in Plaintiff's investigation, William Logie, Vice President for Human Resources and Campus Safety,

7

was selected as the third-step hearing officer (Doc. No. 27-3 at 4).  Plaintiff had Union representation at the hearing.

As Plaintiff notes, Logie did not find Plaintiff guilty of all the allegations giving rise to her investigation (Doc. No. 32 at 10).  Nevertheless, Logie denied Plaintiff's grievance and upheld Miller's decision to discharge her (Doc. No. 27-1 at 329–30).  Plaintiff appealed the decision and the parties proceeded to mediation (Doc. No. 27-1 at 156–57).  Following the unsuccessful mediation attempt, Plaintiff filed a request with her Union to arbitrate her discharge, which was denied (Doc. No. 27-1 at 157–58).  Plaintiff filed three separate appeals of the refusal to arbitrate her case, and each was denied (Doc. No. 27-1 at 331–51).

Contemporaneously with the grievance, Plaintiff filed two unfair labor practice charges with the State Employment Relations Board ("SERB"), asking SERB to rescind the University's new attendance policy (Doc. No. 27-1 at 167).  Both charges were dismissed, as were all requests for reconsideration (Doc. No. 27-1 at 168).  The lawsuit in this Court followed.

### STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When considering a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, this Court determines only whether

this case contains sufficient evidence from which a jury could reasonably find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

DISCUSSION

Plaintiff alleges Defendants violated her First Amendment right to free speech, as well as her Fifth and Fourteenth Amendment rights to equal protection and due process.  These claims arise under 42 U.S.C. § 1983, which creates a civil cause of action against individuals who, while acting under color of state law, deprive a person of the "rights, privileges or immunities secured by the Constitution or laws of the United States."  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).  It is undisputed Defendants were acting "under color of state law."  Rather, the dispute in this case centers around whether Plaintiff suffered a violation of her constitutional rights and, if so, whether Defendants are entitled to qualified immunity.

**Qualified Immunity Framework**

Section 1983 claims are subject to the affirmative defense of qualified immunity, which, if applicable, shields individuals not just against liability, but against the suit itself.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity protects state officials who perform discretionary functions from civil liability so long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (quoting *Pearson*, 555 U.S. at 231).  The doctrine ensures insubstantial claims against government officials are resolved at the earliest possible stage in litigation.  *Id.*

In the Sixth Circuit, courts engage in a two-step sequence when resolving qualified immunity claims.  *Cherrington v. Skeeter*, 344 F.3d 631, 636 (6th Cir. 2003).  As a threshold matter, this Court

9

must ask whether the record, viewed most favorable to Plaintiff, demonstrates Defendants violated her constitutional rights. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* (quotation omitted). On the other hand, if a constitutional violation could be shown upon a favorable view of Plaintiff's submissions, the next sequential step is to ask whether the right was "clearly established." *Id.* (quotation omitted). Plaintiff bears the burden of showing Defendants are not entitled to qualified immunity. *See Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

### *Defendants Did Not Violate Plaintiff's First Amendment Rights*

Plaintiff first accuses Defendants of violating the First Amendment, which is applicable to states by "incorporation" through the Fourteenth Amendment. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 379 (6th Cir. 2008). Specifically, Plaintiff argues Defendants retaliated against her for engaging in free speech by circulating her petition, thereby curtailing her right to associate with co-workers and fellow Union members (Doc. No. 32 at 13–16). Defendants deny Plaintiff's accusations, arguing they did not restrict Plaintiff's right to speech or to oppose the new policy (Doc. No. 28-1 at 9–10). Because this Court must view the record in the light most favorable to Plaintiff, it must accept the allegation she was discharged because of her petition and opposition to the attendance policy. *Cherrington*, 344 F.3d at 636.

In free-speech retaliation cases arising in the employment context, this Court asks three questions. First, was Plaintiff involved in "constitutionally protected" activity -- here, activity protected by the Free Speech Clause of the First Amendment? *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Second, would Defendants' conduct discourage

10

individuals of "ordinary firmness" from continuing to do what they were doing?  *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).  And third, was Plaintiff's exercise of constitutionally protected rights "a motivating factor" behind Defendants' conduct?  *See Mt. Healthy*, 429 U.S. at 287.  Plaintiff must prove each point to prevail.  *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village*, 624 F.3d 332, 337 (6th Cir. 2010).

In order to answer the first question, the Supreme Court has outlined three requirements a First Amendment claimant must show to demonstrate protected speech: (1) the *Connick* "matters of public concern;" (2 ) the *Pickering* "balancing;" and (3) the *Garcetti* "pursuant to" requirements.

The "matters of public concern" requirement.  While public employees retain broad rights under the First Amendment, not all speech is protected.  In fact, only speech that may fairly be considered as relating to issues of "political, social, or other concern to the community" is entitled to protection under the First Amendment.  *Connick v. Meyers*, 461 U.S. 138, 143 (1983); *see also Schmersal v. Major*, 753 F. Supp. 2d 691, 697 (N.D. Ohio 2010).  By contrast, if an employee's speech does not relate to a matter of public concern, public officials enjoy "wide latitude" in responding to it without "intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 143.  Furthermore, under *Connick*, the question is whether the speech "more closely resembled an employee's complaints regarding his superior's actions and his own responsibilities as a[n] [employee] than a citizen's speaking out on a matter of public decisionmaking." *Garvie v. Jackson*, 845 F.2d 647, 651 (6th Cir. 1988).  Whether the speech at issue involves a matter of public concern is a question of law.  *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004).

11

The "balancing" requirement. If the employee establishes her speech touches upon "matters of public concern," a balancing test determines whether the employee or the employer prevails. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Specifically, this Court must balance the employee's interest, as a citizen, in commenting upon "matters of public concern" against the employer's interest in promoting the efficiency of the public services it performs through its employees. *Id.* When no relationship exists between the employee's speech and the proper performance of her daily duties, the employer's interests do not outweigh the employee's desire to "contribute to public debate" like any other citizen. *Id.* at 572–73.

The "pursuant to" requirement. Even if this Court holds the employee's speech relates to a matter of "public concern" and is favored by *Pickering* balancing, this Court must still find the First Amendment applies to the speech at issue. The controlling factor in this regard is whether the employee's expressions were made "pursuant to" her official responsibilities. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). As the Supreme Court emphasized, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

In applying these requirements to the facts of this case, this Court is convinced no genuine issue of fact exists that would result in Plaintiff's conduct being deemed to have been protected speech under the First Amendment.

First, Plaintiff's conduct, while being couched in allegations that her behavior was "union activity" supporting the "collective bargaining power" (Doc. No. 32 at 14–16), does not rise to the level of "matters of public concern." Courts in the Sixth Circuit generally hold "matters of public

12

concern" involve statements or conduct regarding issues that would affect the community at large or would otherwise allow public employees to speak on issues informing the public that public entities, such as the University, are failing to discharge responsibilities in a timely or acceptable manner. *See, e.g.*, *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001); *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003).

Here, Plaintiff did not speak as a citizen on a "matter of public concern." Rather, Plaintiff protested the fairness of the new attendance policy by circulating a petition and forwarding meeting notices by e-mail to her co-workers. Clearly, Plaintiff's motivation was to speak only to Union members and University employees -- not the public at large. Plaintiff's petitioning activity is strikingly similar to the facts in *Connick*, where an employee circulated a "questionnaire" to co-workers asking about their views on office policy, morale, and whether the employees needed a grievance committee. 461 U.S. at 141. As in *Connick*, Plaintiff's conduct is "most accurately characterized as an employee grievance concerning internal office policy" and, therefore, not a "matter of public concern." *Id.* at 154.

Plaintiff argues her "union-related" activities were "matters of public concern" because they were aimed at supporting collective bargaining power. This too is unpersuasive. While the First Amendment protects the right of public employees to unionize and seek redress for grievances through collective bargaining -- it does not provide blanket protection for all union activities. *See Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985). In fact, the Sixth Circuit has firmly held "an employee's speech, activity, or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Id.* Thus, consistent with the principle that incidental references to public issues do not elevate statements to "matters of public concern," see *Farhat*, 370

13

F.3d, 592–93, Plaintiff must go beyond the fact her actions occurred on behalf of others in a union context and demonstrate the focus of her conduct was fairly related to any matter of political, social, or other concern to the community.  *Boals*, 775 F.2d at 693.  This she cannot do.

As discussed above, the focus of Plaintiff's conduct, even if union-related,[2] pertained to the personal interests of employees at the University.  Specifically, Plaintiff sought to rescind a newly-enacted attendance policy.  Her petitioning activity did not go beyond this specific topic, which can only be characterized as an internal personnel dispute.  This conclusion is supported by *Van Compernolle v. City of Zeeland*, a case involving a union president who alleged he was retaliated against for assisting with grievances and speaking out against employment issues.  241 Fed. App'x 244, 249–50 (6th Cir. 2007).  The Sixth Circuit held the president's activities, while "union-related," encompassed nothing more than internal personnel issues.  *Id.* at 250.  Because his activity did not focus "on issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government," it was not actionable under the First Amendment.  *Id.*

As in *Van Compernolle*, Plaintiff's focus was to advance an internal personnel issue, an interest not protected under the First Amendment.  *See also Brandenburg*, 253 F.3d at 898; *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 767 (6th Cir. 2004) (holding employee's request for overtime pay was not a "matter of public concern" but a grievance of personal nature).  To hold otherwise would

---

2

This Court seriously doubts Plaintiff's conduct can be considered "union activity" at all.  As Defendants note, the petition she was circulating complained about a joint Union-management policy.  Plaintiff's Union negotiated and agreed to the policy (Doc. No. 27-1 at 288).  In fact, the Union sent a letter to its members unequivocally disavowing Plaintiff's position (Doc. No. 27-1 at 297).

14

empower public employees to constitutionalize employee grievances, a result the Supreme Court has sharply criticized. *See Borough of Duryea v. Guarnieri*, --- U.S. --- , 131 S. Ct. 2488, 2499 (2011).

Second, Plaintiff's free-speech retaliation claims must fail when considered under the *Pickering* balancing requirement. Certainly, the University's interests in preventing Plaintiff from disrupting employee meetings, using University e-mail systems to solicit employees during working hours, and violating her paid administrative leave, outweigh Plaintiff's interest in exercising her disagreement with the new attendance policy.

Furthermore, any restrictions Defendants placed on Plaintiff's activities were limited to the extent necessary to promote the effective operations of the University. Nothing in the record supports Plaintiff's allegation she was prohibited from associating with members of her Union to advocate her position without retaliation. The record supports just the opposite. For instance, while Plaintiff was told not to use University systems to send union-related e-mails during work, she was permitted to do so from home (Doc. No. 27-1 at 70–71). Plaintiff was also permitted to set up tables and solicit signatures for her petition outside the attendance policy meetings -- even though the meetings occurred during the University's time (Doc. No. 27-1 at 169). And, although Plaintiff's speech did not involve a "matter of public concern," she was not restricted from circulating her petition during non-working hours and was never disciplined for doing so (Doc. No. 27-1 at 169).

As Defendants note, Plaintiff was not placed on paid leave until after complaints were reviewed regarding Plaintiff's threatening behavior in soliciting signatures, after she sent an e-mail instructing Union members to come to her office during working hours to sign the petition, and after she made what Defendants deemed was a disturbing statement about Molina. As the Supreme Court made clear in *Connick*, a state employer "must have wide discretion and control over the management

15

of its personnel and internal affairs," including "the prerogative to remove employees whose conduct hinders efficient operation . . . . " 461 U.S. at 151. After all, "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Id.*

Third, Plaintiff fares no better under the *Garcetti* "pursuant to" requirement. The statement by the Court in that case was clear and unequivocal: when employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. 547 U.S. at 421. Here, Plaintiff's petitioning activities were directly related to the University's official attendance policy -- a policy which bound her and all other members of the Union. The manner in which Plaintiff chose to petition the new policy was considered inappropriate by the University. This Court cannot now choose to insulate Plaintiff's behavior under the shield of the First Amendment.

Even if Plaintiff's claims survived the "matter of public concern," "balancing," and "pursuant to" requirements to prevail under the first point, no genuine issue of fact exists with respect to the remaining two points. First, there is no evidence Defendants' conduct would discourage similar individuals of "ordinary firmness" from taking the actions Plaintiff attempted to take. As explained above, Plaintiff was given wide latitude in protesting the new attendance policy. She was disciplined only after disobeying her supervisors and engaging in conduct her co-workers considered threatening. Second, nothing supports the conclusion Plaintiff's alleged exercise of her free-speech rights was a "motivating factor" behind Defendants' conduct. To the contrary, Plaintiff's discipline stemmed from insubordination, and her ultimate discharge was largely based on her failure to comply with the mandates of her paid leave.

16

### *Defendants Did Not Violate Plaintiff's Fourteenth Amendment Rights*

Plaintiff next alleges "by reason of the aforementioned First Amendment violations," Defendants unconstitutionally deprived her of "the equal protection of the law," and "due process of law" (Doc. No. 1 at 13–14).  Although Plaintiff alleges equal protection and due process violations under both the Fifth and Fourteenth Amendments (Doc. No. 1 at 13), no colorable Fifth Amendment claims exist in this case because that Amendment applies only to federal actors -- not state actors.  *See Betts v. Brady*, 316 U.S. 455, 462 (1942).  Therefore, this Court will only analyze Plaintiff's equal protection and due process claims under the Fourteenth Amendment.

### *<u>Plaintiff Was Not Denied Equal Protection</u>*

Plaintiff's equal protection claim rests on her mistaken belief Defendants deprived her First Amendment rights to petition and associate with co-workers within the collective bargaining agreement.  The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  This language embodies the general rule that states must treat like cases alike but may treat unlike cases accordingly.  *Club Italia Soccer & Sports Org. v. Charter Tp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006) (quotations omitted).  To prevail with her equal protection claim, Plaintiff must demonstrate Defendants treated her "disparately as compared to similarly situated persons," and "such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis."  *Id.*

Here, Plaintiff is not alleging she was a member of a protected, or "suspect," class.  Likewise, Defendants' treatment of Plaintiff did not burden a "fundamental right."  As discussed above, Plaintiff's rights under the First Amendment were not violated because she did not have a right to engage in activity that was not "a matter of public concern."  Because Plaintiff "does not allege the

17

government's actions burden a fundamental right or target a suspect class," her claim can only be based on the so-called "class of one" theory. *Id.* (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). Under this theory, Plaintiff must prove Defendants' actions lacked a rational basis -- that is, were "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude" Defendants' actions were irrational. *Id.* (citing *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)). Plaintiff may overcome her burden by "negating every conceivable basis which might support" Defendants' action, or by showing the challenged actions were "motivated by animus or ill-will." *Id.*

Under rational basis review, Defendants have no obligation to produce evidence to sustain the rationality of their actions; their choices are presumptively valid and "may be based on rational speculation unsupported by evidence or empirical data." *Id.* (internal quotations omitted). The burden falls squarely on Plaintiff, who must overcome the presumption of rationality by alleging Defendants acted in a manner clearly contrary to law. *Id.*

For the same reasons discussed above, Plaintiff cannot overcome this stringent standard. Plaintiff was permitted to petition the new attendance policy but, in doing so, she refused to comply with specific orders from her supervisors. Nothing in the record evidences animus or ill-will, and Plaintiff is otherwise unable to show Defendants' actions were irrational.

### *Plaintiff Was Not Denied Due Process*

Plaintiff also alleges Defendants deprived her of due process. Like the other allegations in this case, Plaintiff's due process claim is based on Defendants' alleged violation of her First Amendment rights to petition and associate. As Defendants note, the Complaint does not specify whether her due

18

process claim is one of substantive or procedural due process.  Her failure to specify, however, is irrelevant.  Plaintiff's claim fails under either analysis.

Substantive due process claims are of two types.  The first type includes claims asserting denial of rights, privileges, or immunities secured by the Constitution or by federal statue.  *Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir. 1993).  Where a specific Amendment provides an explicit source of constitutional protection against a particular type of governmental conduct, "that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing [] claims."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This Court has already considered -- and decided --  Plaintiff's claim in the context of her First Amendment rights.  Doing so again would be duplicative and unnecessary.  *See Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992) ("Absent the infringement of some fundamental right, it would appear that the termination of public employment does not constitute a denial of substantive due process.").

The second type of substantive due process claims are directed at official acts that "shock the conscience."  *Mertik*, 983 F.2d at 1367–680.  The alleged unconstitutional conduct must be "so severe, so disproportionate to the need presented, and such an abuse of authority as to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights."  *Parate v. Isibor*, 868 F.2d 821, 832 (6th Cir. 1989).  Clearly, Plaintiff cannot show Defendants' actions "shock the conscience." As this Court previously held, Defendants had legitimate reasons for disciplining Plaintiff and proceeding in the manner they did.  Nothing in the record shows Defendants' actions were severe, disproportionate, or otherwise transcended the bounds of ordinary tort law to result in a deprivation of Plaintiff's constitutional rights.

Plaintiff's claim also fails under a procedural due process analysis. To prevail, Plaintiff must satisfy a two-part test. First, Plaintiff must establish "a constitutionally protected liberty or property interest." *Midkiff v. Adams County Reg'l Water Dist.*, 409 F.3d 758, 762 (6th Cir. 2005) (citation omitted). Second, Plaintiff must show her interest was deprived without appropriate process -- that is, the procedures attendant upon her deprivation were constitutionally insufficient. *Id.*; *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). There is no dispute Plaintiff had a property interest in continued employment with the University, which could only be terminated for just cause (Doc. No. 28-1 at 18). Therefore, Plaintiff must establish she was terminated without appropriate process. This she cannot do.

While an employee with a protected property interest in continued employment is entitled to a pre-termination hearing, that hearing "need not be elaborate." *Morrison v. Warren*, 375 F.3d 468, 474 (6th Cir. 2004). Due process requires notice of the charges, an explanation of the evidence, and an opportunity to respond. *Id.* Due Process does not require, as Plaintiff argues, credible witnesses or substantiated evidence. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (holding the fundamental requirement of due process is opportunity to be heard at a meaningful time and in a meaningful manner). Plaintiff goes to great lengths attempting to convince this Court that Molina's intimidation charge lacks credibility, and that Defendants failed to substantiate the allegation she did not immediately leave campus after being placed on leave. However, in analyzing Plaintiff's due process claim, this Court only looks at whether the procedures she received prior to her discharge were constitutionally sufficient. After reviewing the record, this Court is satisfied Plaintiff received ample due process before and after her termination from the University.

Plaintiff received three separate hearings.  First, she was given an interview on January 6, 2009, where she met with her supervisors.  The following day, Plaintiff was placed on paid leave and was issued a written confirmation of the terms of leave pending further investigation of University violations.  On January 30, 2009, a second hearing occurred, where Plaintiff was notified of the charges against her.  Plaintiff was represented by her Union at both hearings.  Moreover, at the second hearing, Miller explained the claims against Plaintiff, as well as the evidence the University had to support its claims.  Plaintiff was given an opportunity to present her side of the story, and she did respond.

Plaintiff continued to receive due process even after her termination, when she filed a grievance pursuant to her Union's collective bargaining agreement.  Her grievance was immediately processed to the third step, where Plaintiff was given yet another hearing.  Plaintiff was again provided with notice, representation, and an opportunity to respond to the charges against her.  After her grievance was denied, the process continued to mediation, which was unsuccessful.  Plaintiff then requested her Union pursue her case to arbitration, a request the Union denied three times because Plaintiff could not overcome the "cumulative effects" of the incidents resulting in her discharge (Doc. No. 27-1 at 331).  In fact, the Union informed Plaintiff it was "extremely likely an arbitrator would find the University had just cause for terminating your employment," and the Union did not stand "a good prospect of prevailing in arbitration of your grievance" (Doc. No. 27-1 at 349).

In light of this evidence, Plaintiff's due process claim fails as a matter of law.  Plaintiff cannot demonstrate Defendants violated her substantive due process rights or otherwise failed to afford her procedural due process before terminating her employment with the University.

21

Because the record, viewed in a light most favorable to Plaintiff, does not demonstrate Defendants violated Plaintiff's constitutional rights, "there is no necessity for further inquiries concerning qualified immunity." *Cherrington*, 344 F.3d at 636 (quotation omitted). Defendants are immune from suit as a matter of law.

### CONCLUSION

Plaintiff's case is at its core an internal workplace dispute over a controversial attendance policy. A federal court is not the appropriate forum to review personnel decisions involving an employee's behavior when the employee speaks not as a citizen upon "matters of public concern," but instead as an employee upon matters of personal interest. *Connick*, 461 U.S. at 147. This conclusion is grounded in the "long-standing recognition that the First Amendment's primary aim is the full protection of speech upon issues of public concern, as well as the practical realities involved in the administration of a government office." *Id.* at 154. Indeed, the great principles of free expression safeguarding a public employee's First Amendment right, as a citizen, to participate in discussions concerning public affairs would be greatly diminished if courts confused them with attempts to constitutionalize workplace grievances. *Id.* For all the above reasons, Defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.

    *s/ Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 9, 2012

22